# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| GEORGE S. LAKNER, | ) | Docket No.:3:21-cv-00270-JAM |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JP MORGAN CHASE BANK, N.A. | ) | NOVEMBER 23, 2021 |
| *Defendant.* | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT TO ENFORCE SETTLEMENT AGREEMENT

### I.    OVERVIEW

Beginning in May 2021 and concluding in October 2021, the parties were engaged in negotiations towards a settlement of their dispute in this civil action (the "Action"). Upon the parties reaching agreement on a settlement amount, defense counsel undertook the task of drafting a formal agreement. Included within the Defendant's draft agreement were material terms that had not been negotiated by and between the parties. Moreover, on their face, these new and material terms insisted upon by the Defendant were directly counter to the expressed intentions of the Plaintiff in pursuing settlement and/or were beyond the power of the Plaintiff to control – such that the Plaintiff could be declared to be in default of the parties' agreement irrespective of the efforts of the Plaintiff's to avoid breaching the agreement.

When parties to litigation have reached an agreement to settle their dispute in a matter pending before the court, the court may enforce such an agreement by entering judgment in accordance with the terms of the agreement. The law favors the court's enforcement of settlement agreements in this manner, where the court often plays a role in facilitating such agreements that bring the litigation before it to a close. If a party were permitted to negotiate a settlement of pending litigation, and then effectively disavow the agreement by later insisting upon material terms that were not raised in negotiations with, nor accepted by, the opposing party, such a circumstance would render the entire process illusory, including in instances where the court's involvement in the process facilitated the agreement.

For these reasons, as set more fully set forth herein, the Plaintiff respectfully requests this Court to enter judgment in favor of the Plaintiff, in accordance with the terms of the parties' original settlement agreement.[1]

## II.    CASE BACKGROUND AND PROCEDURAL HISTORY

In this Action, the Plaintiff seeks damages for the Defendant's alleged violations of the Connecticut Unfair Trade Practices Act ("CUTPA"). The Action was filed in Connecticut Superior Court in February 2021 and thereafter removed to Federal Court by the Defendant in March 2021, based upon diversity.

The Plaintiff's claims against the Defendant stem from the Defendant's conduct undertaken as a former mortgage servicer for a mortgage loan on the Plaintiff's residence in New Haven, Connecticut, including the Defendant's initiating a foreclosure action (the "Foreclosure Action")

---

[1] Because the settlement amount agreed upon by the parties is covered by a confidentiality clause, it is not set forth herein, in an effort to maintain confidentiality.

against the Plaintiff in connection with said mortgage loan. See generally, *MTGLQ Investors, L.P. v. Lakner*, NNH-CV13-6035411-S, appeal pending (AC 44017). In April 2018, during the pendency of the Foreclosure Action, the Defendant was removed from the case when the court granted a Motion to Substitute Party, whereby MTGLQ Investors, L.P. ("MTGLQ") replaced the Defendant as the party plaintiff in Foreclosure Action. Id. at 129.10. Thereafter, judgment entered in favor of MTGLQ after a trial to the court, and the Plaintiff's appeal from said judgment is still pending and currently awaiting assignment for argument.

It is the Plaintiff's contention in this action, and in the still pending State court action, that his mortgage servicers and/or mortgage holders, beginning with the failed Washington Mutual Bank ("WaMu") and continuing with the Defendant, followed by MTGLQ, manufactured a default upon his modest $100,000 home mortgage loan, covering his Connecticut seaside property, where the Plaintiff is a retired medical doctor (MD) and Army Colonel. See generally, Mem. of Law in Opp. to Mot. to Dismiss, pp. 5-7, 18-21, ECF No. 22, pp. 9-11, 22-25.

Specifically, it is the Plaintiff's contention that WaMu, leading up to its failure and liquidation, backed-out the interest rate discount from the Plaintiff's mortgage account, which had been applied to the account by WaMu, under the provisions of the "Servicemembers Civil Relief Act" ("SCRA"), 50 U.S.C. § 3937(a), upon the Plaintiff (Colonel Lakner) being called up to active duty in the aftermath of the 9/11/2001 attacks. Id. at pp. 18-21. In 2002, WaMu properly reduced the interest rate charged against the Plaintiff's mortgage account from its fixed rate of 7.25% to 6%, under the provisions of the SCRA. Id. Later, however, shortly before its liquidation by the FDIC, WaMu backed out said interest rate discount, thereby artificially creating a default in the Plaintiff's mortgage account, consistent with the widespread acts of fraud committed by WaMu

- 3 -

leading up to its liquidation – as reported by the United States Senate following an extended investigation of WaMu's failure and liquidation. Id. at 20-21.

It is the Plaintiff's contention in his Appeal of the judgment in the Foreclosure Action that said explanation for the alleged default in his account was concealed from him until the time of trial, due to the inexplicable, complete denial of document discovery in said action. Id. at 11-13, 21-23. No evidence was ever produced in the Foreclosure Action that the Plaintiff ever missed a single monthly payment on his modest mortgage loan, and he was otherwise unable to discover the true underlying basis for the claimed default at the trial itself. Id.

It is the Plaintiff's contention in this Action that the artificially created default in his mortgage account allowed his successive mortgage servicers, beginning with WaMu and followed by the Defendant and MTGLQ, to charge fees against his mortgage account. Id. at pp. 5-6. The Plaintiff further alleges that such a deceptive mortgage servicing scheme is well-established and well-documented, through the efforts of State and Federal Regulators having the duty to regulate the mortgage servicing industry. Id. at pp. 23-26.

The Defendant filed a Motion to Dismiss the Plaintiff's action, which was heard by the Court on May 24, 2021. The Court took the matter under advisement, and the Court's ruling is still pending. It is within the above context that the parties undertook settlement negotiations that began in May 2021 and concluded in October 2021, when the parties reached agreement upon a settlement figure to resolve their litigation.

## III.    FACT BACKGROUND OF PARTIES' NEGOTIATIONS AND SETTLEMENT

The parties' settlement negotiations began on May 13, 2021 with an emailed settlement offer from defense counsel to plaintiff's counsel. Pl.'s Counsel Aff., ¶ 4. Said offer of settlement

- 4 -

included an acceptance deadline of May 20, 2021, four days in advance of argument on the Defendant's Motion to Dismiss, scheduled for May 24, 2021. Id. The only two conditions attached to the Defendant's sum certain offer to settle the parties' litigation were: (1) the Plaintiff release its claims against the Defendant; (2) the settlement agreement be subject to confidentiality. Id.

The parties did not reach a settlement by the initial deadline (5/20/21) set by the Defendant, but negotiations nonetheless resumed after the parties argued the Defendant's Motion to Dismiss to the Court. Id. at ¶ 5. In total, the Plaintiff presented five separate demands and the Defendant made five separate offers to settle, before the parties reached agreement on a sum certain settlement amount, which occurred on or about October 19, 2021. Id. The parties' final settlement figure was within 10% of the midway point of the Plaintiff's initial demand and the Defendant's initial offer. Id.

During argument before the Court on the Defendant's Motion to Dismiss, plaintiff's counsel made clear to the Court the Plaintiff's intention to bring an action against MTGLQ similar to his action against the Defendant, in the event the Plaintiff prevails in Foreclosure Action, as anticipated. Id. at ¶ 6. Plaintiff's counsel related to the Court the Plaintiff's preference to combine the two cases for purposes of litigation efficiency, but that such was not practical from the outset, due to the prospect of a Limitations Defense being asserted by the Defendant, as occurred.

During the course of the parties' settlement negotiations, plaintiff's counsel also made it clear to defense counsel that the only reason the Plaintiff was in a position to substantially discount his initial settlement demand was the prospect of a future recovery against MTGLQ. Id. at ¶ 7. Furthermore, plaintiff's counsel communicated to the Defendant the following: "Mr. Lakner reserves all rights against MTGLQ, as well as its agents, in connection with the pending State court

litigation." Id. Moreover, at no time during the parties' settlement negotiations did the Defendant indicate that, as a condition of settlement, the Plaintiff would in any manner be restrained in his litigation with MTGLQ, and the Defendant did not otherwise change its original two conditions for acceptance of its sum certain offers - (1) Release of Claims and (2) Confidentiality.

After the parties reached agreement on a compromise settlement figure, defense counsel indicated that he would undertake to provide the initial draft of a formal settlement agreement, which included the following clauses:

> While nothing in this Agreement is intended to waive any claims or defenses belonging to Customer against the Substitute Plaintiff to complete the Foreclosure Action, Customer expressly agrees to take no action whatsoever that would directly or indirectly impose any obligations upon Chase to participate in any way in the Foreclosure Action.

> Customer further warrants and represents that he will take all necessary actions to prevent Chase from having to participate, either directly or indirectly, in the Foreclosure Action.

> Chase may assign any of its rights under this Agreement without Customer's consent.  Customer may not assign any rights under this Agreement, the Loan, or any loan document without express written consent from Chase.

The Plaintiff objected to these clauses on the basis that they could be interpreted as: (1) requiring the Plaintiff to terminate its litigation with MTGLQ, if necessary to prevent MTGLQ from compelling the Defendant to participate in the "Foreclosure Action," as a witness or otherwise; (2) allowing the Defendant to assign its Release to MTGLQ, thereby terminating the Plaintiff's claims against MTGLQ; and/or, (3) the Plaintiff being deemed to be in default of the settlement agreement, should MTGLQ take any action to require that the Defendant "participate, either directly or indirectly, in the Foreclosure Action." Id. at ¶ 8.

The Defendant indicated its unwillingness to remove the language quoted above that the Plaintiff found objectionable, with the *possible* exception of amending its ability to assign its

- 6 -

rights, so as to exclude MTGLQ from such an assignment. Therefore, in an effort to both retain the language insisted upon by the Defendant, while simultaneously addressing the Plaintiff's concerns for the potential implications of said language, the Plaintiff then proposed the following language be added to the Defendant's settlement draft:

### Customer's Litigation with Substitute Plaintiff

The Parties acknowledge that the Customer [Lakner] is involved in litigation with the Substitute Plaintiff [MTGLQ], and nothing in this Agreement shall be interpreted as limiting or restraining the claims, counterclaims and defenses that the Customer may assert against the Substitute Plaintiff, as well as its agents or assigns (collectively, the "Substitute Plaintiff"); *except*, in asserting claims or counterclaims against the Substitute Plaintiff, the Customer may only pursue wrongful conduct that is alleged to have occurred after April 9, 2018 – the date MTGLQ was substituted in the Foreclosure Action for Chase, as described in paragraph H above. The Customer shall not be deemed in breach of this Agreement for any action taken by the Substitute Plaintiff in its litigation with the Customer, except that the Customer will cooperate with Chase in resisting any efforts by the Substitute Plaintiff to involve Chase in its litigation with the Customer, including as described in paragraph 25 "Further Assurances." Notwithstanding Customer's agreement to restrict his allegations of wrongful conduct against the Substitute Plaintiff to conduct that occurred after Chase's departure from the Foreclosure Action, as described herein and as referenced in paragraph H, should Chase be compelled to indemnify the Substitute Plaintiff for the Substitute Plaintiff's liability, if any, to the Customer, then the Customer shall hold Chase harmless for any said liability to the Substitute Plaintiff, up to the amount of the Payment set forth in paragraph 3 - $ [Intentionally kept blank due to confidentiality clause].

Id. at ¶ 9.

In response to said draft language submitted by the Plaintiff, defense counsel responded with an email communication that stated the following: "I've reviewed your proposed changes with the client and they are rejected at this time." Id. at ¶ 10. There was no indication accompanying this rejection that the Defendant was interested in proposing any alternative language to address the Plaintiff's concerns regarding his ability to litigate freely against MTGLQ. Id. Moreover, now that the Defendant had specifically rejected said proposed language, it became

- 7 -

the opinion of plaintiff's counsel that the objectionable language in the Defendant's draft agreement had shifted from presenting a potential ambiguity, as to the Plaintiff's ability to litigate freely against MTGLQ, to a likelihood, where the proposed corrective language had been specifically raised and rejected during the drafting process. Id.

With respect to the Plaintiff's request for the costs of this Motion, the Defendant presented the following statement of its intentions with its original offer of settlement, which was to avoid "the inherent risk of litigation and the legal fees expected to be incurred." Id. at ¶ 4. The Plaintiff, in turn, communicated to the Defendant that the Plaintiff's ability to further discount his Demand at the final stages of the negotiations was a function of the willingness of plaintiff's counsel to extend a fee discount to the Plaintiff, in consideration of counsel's ongoing litigation responsibilities to the Plaintiff in this Action coming to an end, which intention has been undermined by the need to pursue the subject Motion. Id. at ¶ 11.

IV. **ARGUMENT**

A. **Applicable Law**

As the Court's jurisdiction in this matter is based upon diversity, the law of the forum State is to be applied in determining whether or not the parties have an enforceable settlement agreement. *Omega Engineering, Inc. v. Omega, S.A*, 432 F.3d 437, 443 (2d Cir. 2005). Under Connecticut law, "A trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous." *Audubon Assoc. Ltd. Partnership v. Barclay Stubbs,* 225 Conn. 804, 811 (1993).

B. **Discussion**

In a very recent opinion of the Connecticut Appellate Court, the Court provided an in-depth analysis of the factors to be considered in determining whether or not a trial court should enforce

a purported settlement agreement between the parties. *Wittman v. Intense Movers, Inc.*, 202 Conn. App. 87 (2021). The *Wittman* Court set out the general principles to be applied as follows:

> A settlement agreement is a contract among the parties. ... A contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation. The law does not ... regard an arrangement as completed which the parties regard as incomplete. ... In construing the agreement ... the decisive question is the intent of the parties *as expressed* .... The intention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish. Furthermore, [p]arties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated.

Id. at 98-99 (Citations omitted and internal quotation marks omitted.)(Original emphasis).

Significantly, the *Wittman* Court made it clear that the parties can have an enforceable settlement agreement, even when the specific language of the agreement has yet to be determined and the parties are still engaged in negotiations to finalize their agreement, where "some of the terms" of the agreement "are still indefinite."

> Finally, [t]he fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings does not establish the time at which their undertakings ripen into an enforceable agreement ... [and we are aware of no authority] that assigns so draconian a consequence to a continuing dialogue between parties that have agreed to work together. We know of no authority that precludes contracting parties from engaging in subsequent negotiations to clarify or to modify the agreement that they had earlier reached. More important ... [when] the general terms on which the parties indisputably had agreed ... included all the terms that were essential to an enforceable agreement ... [u]nder the modern law of contract ... the parties ... may reach a binding agreement even if some of the terms of that agreement are still indefinite.

Id. at 99 (Citations omitted and internal quotation marks omitted.)

Here, the essential, material terms of the parties' settlement agreement were made clear within the scope of the Defendant's original offer to settle, which set forth four essential terms: (1)

the Defendant's payment to the Plaintiff of a sum certain; (2) the Plaintiff releasing his claims against the Defendant; (3) that the specifics of the parties agreement were to be kept confidential; and (4) the limited time period for the Plaintiff to accept the offer - by May 20, 2021, four days in advance of the Court taking up the Defendant's Motion to Dismiss. The very nature of the Defendant's offer to settle, as presented, was to avoid the uncertainty and costs of having the Court address the Defendant's dispositive motion on May 24, 2021. Within said context, it is clear that the Plaintiff was in a position to communicate his acceptance of the Defendant's settlement terms, as presented, by the May 20, 2021 deadline, and by doing so would thereby terminate the pending litigation. The Defendant's intentions were clear in this respect.

Though the parties did not settle their case prior to the Court hearing argument on the Defendant's Motion to Dismiss, the context of the Defendant's original settlement offer did not materially change during the course of the settlement negotiations that took place thereafter, in that a prospective settlement still provided the same benefit as originally articulated by the Defendant – that of avoiding the costs and uncertainty of further litigation. Moreover, at no time during the settlement negotiations that ensued thereafter did the Defendant alter or add to its original conditions of settlement, which were the payment of a sum certain amount in consideration for a release of claims and confidentiality agreement.

Furthermore, at no time did the Defendant condition its offers of settlement upon the Plaintiff accepting restrictions upon his ability to pursue litigation against MTGLQ. The failure of the Defendant to include or express any conditions or restrictions involving MTGLQ with its settlement offers occurred within the context of the Plaintiff making clear his intention of pursuing claims against MTGLQ, during oral argument on the Defendant's Motion to Dismiss. Furthermore,

during the parties' negotiations, the Plaintiff specifically informed the Defendant that his willingness to reduce his settlement demands was a function of his anticipated ability to pursue damages against MTGLQ.

No problems concerning MTGLQ arose until after the parties reached agreement on a settlement amount. As set forth above, the Defendant's draft of a formal settlement agreement included terms that the Plaintiff found objectionable, due to the potential to interpret said terms as restricting or impairing the Plaintiff's ability to litigate against MTGLQ. When the Defendant insisted upon retaining said objectionable language in the agreement, the Plaintiff agreed to do so so long as the agreement included additional language making it clear that nothing set forth in the parties' agreement was intended to limit or impair the Plaintiff's ability to litigate against MTGLQ.

In summary, the parties reached full agreement on the material terms and conditions of the Defendant's settlement proposal, which included terms specifying (1) payment, (2) Release of Claims, and (3) Confidentiality. At most, the Defendant could argue that it also intended to incorporate protections against it being required to participate in the Plaintiff's pending and/or prospective litigation with MTGLQ. If at any point during the parties' negotiations, the Defendant actually developed and/or harbored such intentions, the Defendant failed to communicate the same to the Plaintiff.

Under the holding in *Wittman v. Intense Movers, Inc.*, supra, 202 Conn. App. at 102-103, such an "unexpressed intent" will not alter the express terms of the parties' settlement agreement, nor will the subsequent failure to reach agreement on a party's unexpressed intent render the parties' settlement agreement unenforceable. Indeed, if a litigant were permitted to disavow a settlement agreement by insisting upon a new and material term that it failed to express during

negotiations leading to an agreement, then it could become common practice for routine settlement agreements reached between litigants to be rendered illusory.

Finally, the Defendant clearly articulated its intended purpose of pursing settlement of the litigation, in part, in order to avoid the future costs of litigation. Similarly, Plaintiff's counsel made clear to the Defendant that the final compromises undertaken by the Plaintiff to bridge the parties' settlement gap were a function of Plaintiff's counsel discounting his fees, in consideration of being relieved of his obligation to provide further litigation services to the Plaintiff in this matter. Under these circumstances, given said express intentions of both parties, the Plaintiff respectfully submits that the Court should award to the Plaintiff the costs of this Motion to enforce the parties' settlement agreement.

## **CONCLUSION**

For all of the reasons set forth above, the Plaintiff's Motion for Judgment should be granted in the amount of the parties' settlement, to be supplied *in camera* initially, in an effort to maintain the confidentiality of the settlement. In addition, the Plaintiff should be awarded the fair and reasonable costs of this Motion, as the parties' joint, expressed intention in reaching their agreement was, in part, to avoid the costs of such motion practice, made necessary by the Defendant's conduct.

PLAINTIFF
GEORGE LAKNER,

By   */s/ Thomas P. Willcutts*
Thomas P. Willcutts
(Fed Bar: ct09422)
Willcutts & Habib LLC

- 12 -

100 Pearl Street; 14th Fl
Hartford, CT 06103
Tel: (860) 249-7071
Email: tpw@willcutts.com

## **CERTIFICATION**

This is to certify that on this 24th day of November, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


Brian D. Rich, Esq.
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103


                                        By */s/ Thomas P. Willcutts*
                                            Thomas P. Willcutts
                                            Fed Bar: ct09422